**AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANTS**

I, Craig A. Graham, a Special Agent (SA) with the Federal Bureau of Investigation (FBI),

being duly sworn, depose and state as follows:

**INTRODUCTION**

1.        I am a Special Agent with Federal Bureau of Investigation (FBI), and am assigned

to the Boston Field Office, Providence, RI.  I have been an FBI agent since 2010.  As part of my

duties, I am authorized to investigate violations of the laws of the United States, including

criminal violations relating to child exploitation, child pornography, coercion and enticement,

and transportation of minors, including but not limited to, violations of 18 U.S.C. §§ 2422, 2251,

2252, and 2252A.  I have received training in the investigation of internet crime, child

exploitation, transportation of minors, and child sexual abuse, and have observed and reviewed

examples of child pornography (as defined in 18 U.S.C. § 2256).

2.        This affidavit is submitted in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure to search:

        (a)  The person of Jeremy Patrick Barton, year of birth 1980, (hereinafter the

            "SUBJECT PERSON"),

        (b)  The premises located at 49 Osceola Avenue, Narragansett, Rhode Island

            02882 (the "SUBJECT PREMISES),

and the content of any electronic media storage devices or media located on the SUBJECT

PERSON or in the SUBJECT PREMISES, as more fully described in Attachments A-1 and A-2,

which are incorporated herein by reference; and to seize evidence, instrumentalities, fruits of

crime, and contraband as more fully described in Attachment B, which is also incorporated herein by reference.

3.      The statements in this affidavit are based in part on information provided by FBI Agents in the FBI Knoxville Division, Tennessee, and on my investigation of this matter.  Since this affidavit is being submitted for the limited purpose of securing search warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2251(a) (production of child pornography); 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1) (distribution of child pornography); 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) (possession of and access with intent to view a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography); and 18 U.S.C. § 2422(b) (use of means of interstate or foreign commerce to persuade, entice, or coerce a minor to engage in explicit sexual activity), (collectively, the "SUBJECT OFFENSES"), are presently located at the SUBJECT PREMISES.

## PROBABLE CAUSE[1]

---

[1] The following definitions apply to this Affidavit and Attachment B:
     a.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver.  Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and email.
     b.      "Chat room," as used herein, refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals may also have the ability to transmit electronic files to other individuals within the chat room.
     c.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

d.       "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image of picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

e.       "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices.  See 18 U.S.C. § 1030(e)(1).

f.       "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

g.       "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

h.       "Hashtag," as used herein, refers to a word or phrase preceded by a hash or pound sign (#), which is used to identify messages or groups on a specific topic.

i.       "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination.  Most Internet Service Providers (ISPs) control a range of IP addresses.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.  ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

j.       "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

k.       The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

l.       "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

m.       "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

3

5.      In March and April 2022, an FBI online covert employee (OCE) was operating on Kik[2] and communicating with other users who were members of multiple Kik groups.  Within these groups, the OCE observed users trade download links containing Child Sexual Abuse Material (CSAM).  The OCE identified a Kik account user who had acted in an administrator role in at least three of these groups.  The first Kik account associated with the user had a display name of "Tom Baxter," username "baxter3065."  During the course of communication between the OCE and the subject account user, the user also communicated with Kik display name "Tom Jones," username "ralovesjn," and display name "Jack Meoff,' username "itsmeyoo4321".  Hereafter, all three accounts will be referred to as the Subject Account.

6.      In March 2022, Kik provided the following subscriber information for Kik account baxter3065: (1) Name: Tom Baxter; (2) Email: ma130653065@gmail.com; (3) Username: baxter3065.  The account was registered on 02/23/2022 using email address

---

n.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

o.      "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

p.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

q.      A "storage medium" is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, thumb drives, and other magnetic or optical media.

r.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

[2] Kik Messenger, commonly called Kik, is a free instant messaging mobile application that can be used on both Android and iOS operating systems.  The application uses the device's data plan or Wi-Fi to transmit and receive messages, photos, videos, mobile web pages, links, and other content.

ma130653065@gmail.com and an iPhone.  The majority of IP addresses provided by Kik for the account were from 71.117.179.148.

7.      On or around April 19, 2022, the Subject Account, at this time using the Kik account display name "Tom Jones," username "ralovesjn," provided his Snapchat[3] account as "ma306513065," which is identical to the email address associated with Kik account baxter3065.

8.      In response to the OCE asking "You get that thing off last night," the Subject Account stated "Ohhh yea.  Meet some kid on Omegle[4]" and "He said he was 16 but he dose not look like it."  The Subject Account then sent the OCE an image of a penis with no visible pubic hair, believed to be from a victim.

9.      During the same conversation, in response to the OCE asking if he could also communicate with the victim, the Subject Account stated, "I don't know I can say I have another girlfriend if he was interested.. he left his location on his snap so seen what street he was on so I google it seen his house then check Facebook to see if he was who he said and I found his moms Facebook lol."  The Subject Account also advised that he had transitioned the communication with the victim from Omegle to Snapchat[5].

10.     I interpret the above statement from the Subject Account to imply that the account user determined the victim's location from examining the victim's Snapchat account, viewed the

---

[3] Snapchat is a multimedia instant messaging application which allows users to send each other messages, images, and videos.

[4] Omegle is a free online chat website that allows users to communicate with other users through messages and video without a need to register user information.

location of the victim's home, and identified the victim's family through the victim's mother's Facebook account.

11.     The Subject Account also sent the OCE a video of a male masturbating in which the male's hand, penis, and torso can be seen.  The video is approximately 24 seconds long and appears to be of the same victim.  The communications that proceed and follow the video also imply that it is from the same victim.

12.     From the video sent to the OCE, the FBI was able to identify the victim as a 12 year-old boy.  The Snapchat account name displayed in the video was identical to the victim's name.  The victim, hereafter referred to as Victim 1, was born in 2009 and resides in Mustang, Oklahoma.  FBI agents have identified and contacted Victim 1's father and an interview of Victim 1 is scheduled for May 4, 2022.  The victim's father has advised that Victim 1 admitted to communicating with an individual online and sending images/videos to that individual.

13.     On or around April 24, 2022, the Subject Account contacted the OCE using display name "Jack Meoff,' username "itsmeyoo4321," and stated, "Hey it's Tom."  In response to the OCE asking the Subject Account ,"You still talking to snap boy" the Subject Account replied, "No he has not been on snap at all…. I think he got in trouble."

14.     On or around April 27, 2022, the Subject Account stated, "Hey I got another one didn't stay on long he came quick" and then advised that the victim he was referring to provided their age as 13 or 14.  The Subject Account later sent an approximately two minute long video to the OCE.  The video is of an Omegle chat where masturbation is being discussed and also includes a video of a male masturbating under a piece of bedding or clothing.  The male's torso, arms, and part of his genitals are exposed during the video.

6

15.     On April 27, 2022, Verizon provided a verbal response to an Emergency

Disclosure Request for IP address 71.117.179.148 as of 03/17/2022.  Subscriber information was

provided as the following:

> IP Address: 71.117.179.14
> JAS P Barton
> 49 Osceola Ave., Narragansett, Rhode Island 02882
> Telephone number: 401-932-2851
> Customer since 08/2021

16.     A check of publicly available databases revealed that Jeremy Patrick Barton, year

of birth 1980; James P. Barton, year of birth 1960; and M. Natalie Barton, year of birth 1958,

reside at the SUBJECT PREMISES.  A review of Rhode Island Department of Motor Vehicle

records indicated that the SUBJECT PREMISES is listed on licenses for all three individuals.

17.     A search of the Rhode Island Sex Offender Registry indicated that Jeremy P.

Barton is a "level three" registered sex offender who resides at the SUBJECT PREMISES and is

currently on probation until 2026.  In 2019, he was convicted of two counts of Second Degree

Sexual Assault on a 14 year old male.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO ADVERTISE, TRANSPORT, DISTRIBUTE, RECEIVE, POSSESS, AND/OR ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

25.     Based on my previous investigative experience related to child exploitation

investigations, and the training and experience of other law enforcement officers with whom I

have had discussions, I know there are certain characteristics common to individuals who

distribute, receive, possess, and/or access with intent to view child pornography:

> a.   Such individuals may receive sexual gratification, stimulation, and satisfaction

from contact with children, or from fantasies they may have viewing children engaged in sexual

activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

      b.   Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

      c.   Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

      d.   Based on my training and experience, it is typical of individuals involved in child pornography to be initially reluctant to admit possessing child pornography or be willing to share such materials with other individuals on-line and to falsely and or inaccurately claim they deleted "all" of their child pornography collections.  Often times such individuals maintain child pornography on a variety of different media and continue to keep child pornography even when some such materials are "deleted".  This is particularly true of individuals who have distributed child pornography in the past.

e.   Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly.  Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

f.   Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[6]

g.   Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

h.   Such individuals prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers

---

[6] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370–71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010).)

involved in the investigation of child pornography throughout the world.  Thus, even if an individual uses a portable device (such as a mobile phone) to access the internet and child pornography, it is more likely than not that evidence of this access will be found in his home – here, the SUBJECT PREMISES, as set forth in Attachment A-2.

i.    Based upon the foregoing, I believe that the SUBJECT PERSON likely displays characteristics common to individuals who access with the intent to view and possess, collect, receive, or distribute child pornography.  I submit that there is probable cause to believe that contraband material depicting minors engaged in sexually explicit conduct and other evidence, instrumentalities, and fruits of violations of possession and access with intent to view child pornography in violation of the SUBJECT OFFENSES exist at the SUBJECT PREMISES.

BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

18.    I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

a.    Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

b.    Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital  camera or smartphone may be stored on a removable

memory card in the camera or smartphone.  These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.   A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections.  Electronic contact can be made to literally millions of computers around the world.  Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.   The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer – can store thousands of images or videos at very high resolution.    It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices.   Some media storage devices can easily be concealed and carried on an individual's person.  Smartphones and/or mobile phones are also often carried on an individual's person.

e.   The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.   Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may

provide e-mail services and/or electronic storage of computer files in any variety of formats.  A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone or external media in most cases.

g.   As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional (i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files).  Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained indefinitely until overwritten by other data.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

19.      As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PERSON and at the SUBJECT PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

20.         I submit that if a computer or storage medium, including a smart phone, is found

on the SUBJECT PERSON and/or at the SUBJECT PREMISES, there is probable cause to

believe those records will be stored on that computer or storage medium, for at least the

following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been downloaded

onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a

storage medium can be stored for years at little or no cost.  Even when files have been deleted,

they can be recovered months or years later using forensic tools.  This is so because when a

person "deletes" a file on a computer, the data contained in the file does not actually disappear;

rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or

slack space—that is, in space on the storage medium that is not currently being used by an active

file—for long periods of time before they are overwritten.  In addition, a computer's operating

system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular,

computers' internal hard drives—contain electronic evidence of how a computer has been used,

what it has been used for, and who has used it.  To give a few examples, this forensic evidence

can take the form of operating system configurations, artifacts from operating system or

application operation, file system data structures, and virtual memory "swap" or paging files.

Computer users typically do not erase or delete this evidence, because special software is

typically required for that task.  However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

21.   As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium on the SUBJECT PERSON and/or at the SUBJECT PREMISES because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove

each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic

15

and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

      c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

      d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.  I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

22.     Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.  Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be

necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

b.   Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.   The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.   Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed

18

when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

23.     Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime.  This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly.  Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network.  Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

24.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may

require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRICS

25.       This application seeks permission for law enforcement to compel Jeremy P. Baron, the SUBJECT PERSON, to unlock any devices requiring biometric access subject to seizure pursuant to this warrant.  The grounds for this request are as follows:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices—particularly newer mobile devices and laptops—offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

20

c.   If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.   If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.   In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

21

f.   As discussed in this affidavit, based on my training and experience, I believe that one or more digital devices will be found during the search. Further based on my training and experience, law enforcement personnel may not be able to fully execute the search authorized by this search warrant and thereby access the data contained within such device(s) without the use of biometric features.

g.   I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for eight hours and the passcode or password has not been entered in the last six days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.   In my training and experience, the person(s) who is or are in possession of a device or has the device among his or her belongings or at his or her premises at the time the device is found is likely to be a user of the device.

i.   Due to the foregoing, if law enforcement personnel encounter device(s) that is or are subject to seizure pursuant to this search warrant and may be unlocked using one of the

22

aforementioned biometric features, the search warrant I am applying for would permit law enforcement personnel, acting as soon as reasonably practicable, to compel the following: (1) press or swipe the fingers (including thumbs) of those present at the SUBJECT PREMISES to the fingerprint scanner of the device(s) found at the premises; (2) hold the device(s) found at the premises in front of the face of those present at the SUBJECT PREMISES and activate the facial recognition feature; and/or (3) hold the device(s) found at the premises in front of those present at the SUBJECT PREMISES and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this search warrant.

## REQUEST FOR SEALING OF AFFIDAVIT

26.     It is respectfully requested that this Court issue an order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant, and the requisite inventory notice (with the exception of one copy of the warrant and the inventory notice that will be left at the SUBJECT PREMISES).  Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation and not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, *i.e.*, post them publicly online through forums.  Premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on this continuing investigation and may jeopardize its effectiveness by alerting potential targets

to the existence and nature of the investigation, thereby giving them an opportunity to flee, or to destroy or tamper with evidence.

## **CONCLUSION**

27.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein, the SUBJECT OFFENSES, have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachments A-1 and A-2. I respectfully request that this Court issue a search warrant for the locations described in Attachment A-1 and A-2, authorizing the seizure and search of the items described in Attachment B.

28.     I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.


Sworn to under the pains and penalties of perjury,


_____
Craig A. Graham
Special Agent
Federal Bureau of Investigation


24

Attested to by the applicant in accordance with the requirements of Fed.
R. Crim. P.  4.1 <u>by</u>  ,  Telephone

*(specify reliable electronic means)*

_____          _____
Date                                                          Judge's signature

_____          _____
City and State                                        Magistrate Judge Patricia A. Sullivan

## **ATTACHMENT A-1**

## **DESCRIPTION OF PERSON TO BE SEARCHED**

The person of Jeremy Patrick Barton, a male, standing approximately 5'6", weighing approximately 140 pounds, year of birth 1980, (the SUBJECT PERSON).  The search shall include the content of any electronic media storage devices, including smart phones, or media located on the person of Barton, regardless of the location at which he may be found.



**<u>ATTACHMENT A-2</u>**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

The entire property located at 49 Osceola Avenue, Narragansett, RI 02882, including the residential building, any outbuildings, and any appurtenances thereto (the SUBJECT PREMISES).  The building is a single-family, one story home with wood siding, green trim, and a white storm door.  The number "49" is clearly affixed to the front of the building.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Sections 2252, 2252A and 2422:

1. Computers or storage media, including smart phones, used as a means to commit the violations described above.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

28

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

e.  evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.  contextual information necessary to understand the evidence described in this attachment.

29

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography, visual depictions of minors engaging in sexually explicit conduct, and child erotica.

5. Records, information, and items relating to violations of the statutes described above including:

    a. Records, information, and items relating to the occupancy or ownership of the SUBJECT PREMISES, 49 Osceola Avenue, Narragansett, RI, including utility and telephone bills, mail envelopes, or addressed correspondence;

    b. Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

    c. Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

    d. Records and information relating to the sexual exploitation of children, including correspondence and communications between users of Kik, Snapchat, and Omegle;

    e. Records and information showing access to and/or use of Kik, Snapchat, and Omegle; and

    f. Records and information relating or pertaining to the identity of the person or persons using or associated with the Subject Account.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media

that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

During the execution of the search of the SUBJECT PREMISES described in Attachment A-2, law enforcement personnel are also specifically authorized to compel the SUBJECT PERSON, Jeremy P. Barton, to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

(a)     any of the DEVICES found on the SUBJECT PERSON and any of the DEVICES found at the SUBJECT PREMISES, and

(b)     where the DEVICES are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments,

31

for the purpose of attempting to unlock the DEVICES' security features in order to search the contents as authorized by this warrant.